DA 06-0194

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 56

COREY JAY WAMSLEY and JEFFREY ALAN WAMSLEY,
as Co-Personal Representatives of the Estate of
ALAN and SHARON WAMSLEY, Deceased,

      Plaintiffs and Appellees,

  v.

NODAK MUTUAL INSURANCE COMPANY, a North Dakota
corporation, and JOHN DOE, as Personal Representative
of the Estate of Lester Stanton, Deceased,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV 2003-336
Honorable Holly B. Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jared S. Dahle, Nelson & Dahle, P.C., Billings, Montana

      For Appellees:

          Anne G. Biby, Hash & O'Brien, PLLP, Kalispell, Montana

Submitted on Briefs:  February 14, 2007

Decided:  February 19, 2008

Filed:

_____
                  Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 On June 23, 2003, Appellees Corey Jay Wamsley and Jeffrey Alan Wamsley, in their capacities as co-Personal Representatives of the Estate of Alan and Sharon Wamsley (Estate), filed suit against Appellant Nodak Mutual Insurance Company (Nodak) in the Eighteenth Judicial District. The Estate sought compensation for damages from an August 2002 automobile accident near Bozeman, Montana, in which their parents, Alan and Sharon Wamsley (Wamsleys), were killed. In its suit, the Estate sought to "stack," or combine the coverage of, three underinsured motorist (UIM) policies issued to the Wamsleys by Nodak. Nodak disputed its obligation to stack these three policies.

¶2 After lengthy legal proceedings, on November 9, 2005, the District Court rendered a stipulated judgment against Nodak pursuant to M. R. Civ. P. 54. In its order, the District Court held the Estate could stack all three UIM policies, and rendered final judgment against Nodak in the amount of $400,000.00. On appeal, Nodak challenges this order as well as the District Court's denials of its motion to stay, its motions for summary judgment, its motion to reconsider, and a grant of summary judgment to the Estate on the issue of stacking. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 Although complicated, the facts and chronology in this case are not in dispute. On August 8, 2002, the Wamsleys were traveling eastbound in a Chrysler Voyager minivan on Interstate 90 near Bozeman, Montana. Lester Stanton, a Montana resident, was traveling westbound on the opposite side of Interstate 90 at the same time. Stanton was highly intoxicated and passed out while driving. As a result, he crossed the highway

2

meridian and collided with the Wamsleys' minivan. The impact from the crash spun the Wamsleys' vehicle into a motor home which was traveling behind it on Interstate 90. The Wamsleys and Stanton were all killed. The Wamsleys had been residents of North Dakota and insured with Nodak, a North Dakota-based insurance carrier. Stanton was insured by an Idaho-based insurance carrier, Progressive Specialty Insurance. After their death, two of the Wamsleys' six children, Corey and Jeffrey Wamsley, were appointed co-Personal Representatives of the Wamsleys' Estate.

¶4  After the accident, the Estate obtained Montana counsel. The Estate received $50,000.00 from Progressive, representing the coverage limits of Stanton's policy. Because the damages from the accident exceeded this amount, the Estate sought additional payment from Nodak under three UIM policies held by the Wamsleys prior to their death. The policies provided UIM coverage in the amount of $100,000.00 per insured, for each vehicle covered. The Wamsleys owned a total of three vehicles covered under these terms, one of which was the Chrysler Voyager minivan which the Wamsleys were driving on August 8, 2002. The other two vehicles were garaged in North Dakota at the time of the accident. If allowed, the stacking of these policies would permit the Estate to seek a total of $600,000.00 in UIM claims.

¶5  In December 2002 the Estate's counsel notified Nodak of its intent to stack all three UIM policies. At the time of this demand, we were considering, but had not yet decided, *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, 315 Mont. 107, 67 P.3d 892. At issue in *Hardy* was the constitutionality of § 33-23-203, MCA, a statute passed by the Montana Legislature which prohibited the stacking of UIM policies. The Estate's

Montana counsel notified Nodak of this pending litigation and stated her belief that we would likely find the statute unconstitutional and allow the stacking of UIM claims. As a settlement proposal, the Estate offered to accept $400,000.00 from Nodak in exchange for dropping its UIM claims for the full amount of $600,000.00.

¶6 On April 7, 2003, Nodak paid the Estate $200,000.00 for UIM coverage on the Chrysler minivan involved in the accident. However, Nodak continued to dispute its obligation to stack the two remaining UIM policies. On April 18, 2003, we decided *Hardy*, overturning § 33-23-203, MCA, and holding that stacking of UIM policies was allowed in Montana as a matter of public policy. *Hardy*, ¶¶ 38, 45. Immediately after *Hardy* issued, the Estate restated its demand that Nodak provide payment under the remaining two UIM policies, an amount totaling $400,000.00. The Estate set a response deadline of April 28, 2004, after which it stated it would file suit against Nodak. Counsel for Nodak requested more time to study the matter, which the Estate graciously granted. On May 20, 2003, Nodak informed the Estate it was still investigating its demand, and requested further time to complete its investigation.

¶7 In truth, Nodak was preparing to seek a declaratory judgment in North Dakota on the Estate's UIM claims. On June 4, 2003, Nodak initiated an action in District Court in Kidder County, North Dakota. Nodak sought a declaration that the Wamsleys' UIM policies could not be stacked under North Dakota law. The Wamsleys' surviving children were named as defendants. A "courtesy" notice of this lawsuit was received by the Estate's counsel on June 6, 2003.

4

¶8 Meanwhile, litigation on this matter was also underway in the Eighteenth Judicial District Court in Gallatin County, Montana. On June 23, 2003, the Estate filed suit against Nodak and sought to stack the UIM policies, seeking recovery of $400,000.00 in compensatory damages. The Estate also sought punitive damages for violations of the Montana Unfair Trade Practices Act, §§ 33-18-101 through 1006, MCA. On July 23, 2003, Nodak responded in the Montana action by filing a "Limited Appearance to Contest Personal Jurisdiction" pursuant to M. R. Civ. P. 12. On August 13, 2003, the Estate moved for partial summary judgment on its stacking claims. On August 14, 2003, Nodak filed a motion to stay the Estate's motion pending the outcome of its declaratory judgment action in North Dakota.

¶9 On October 7, 2003, while Nodak's motion to stay was under consideration, the North Dakota District Court ruled that North Dakota law would be applied in Nodak's declaratory judgment action. Nodak brought this ruling to the District Court's attention in the Montana action. On November 5, the District Court in Montana held oral argument on Nodak's motion to stay and subsequently denied it.

¶10 Notably, on November 11, Nodak moved for partial summary judgment in the Montana District Court, arguing for the first time the District Court lacked personal jurisdiction over it and that North Dakota law should apply to the Estate's claims. Nodak also argued the District Court in Montana was required to grant the North Dakota ruling full faith and credit, and that collateral estoppel barred the Estate from litigating its UIM claims in Montana. On November 14, the District Court held oral argument on the Estate's previous summary judgment motion on the issue of stacking. That same day the

5

District Court ruled it had *in personam* jurisdiction over Nodak and that the Estate was allowed to stack the UIM policies as a matter of law, in effect refusing to accredit the North Dakota rulings on choice of law.

¶11    Five days later, on November 19, 2003, after the Montana District Court had already ruled on the Estate's stacking claims, the North Dakota District Court granted summary judgment to Nodak holding it was not obligated to stack the UIM policies. The next day, the District Court in Montana denied Nodak's motion for partial summary judgment, ruling that North Dakota law did not apply to the Estate's stacking claims in Montana and that the claims were not barred by collateral estoppel. Subsequently, Nodak moved the court to reconsider its denial of Nodak's motions to stay and partial summary judgment. On January 27, 2004, the District Court denied Nodak's motion to reconsider.

¶12    On September 13, 2004, the North Dakota Supreme Court, over one dissenting Justice, upheld the North Dakota District Court's declaratory judgment, finding that North Dakota law applied to the UIM claims and did not allow stacking. *Nodak Mut. Ins. Co. v. Wamsley*, 687 N.W.2d 226 (N.D. 2004). On September 30, 2004, the District Court in Montana entered an order rendering judgment against the Estate of Lester Stanton in the amount of $700,000.00. On December 2, 2004, after obtaining this judgment and serving notice on all parties, the Estate moved for partial summary judgment in the amount of $400,000.00 for its UIM claims and sought an entry of final judgment pursuant to M. R. Civ. P. 54(b). In response, Nodak opposed the Estate's motion and filed another cross-motion for summary judgment, again arguing that the

North Dakota Supreme Court's decision in *Nodak* should be given full faith and credit. Nodak's motions were again denied.

¶13   Other issues not relevant to the current appeal continued to be raised and argued before the District Court. On September 2, 2005, both parties entered into mediation in this matter and subsequently entered into a Stipulation Regarding Final Judgment. Pursuant thereto, on November 9, 2005, the District Court entered final judgment against Nodak in the sum of $400,000.00, and certified the judgment as final pursuant to M. R. Civ. P. 54(b). Nodak timely appealed.

## ISSUES

¶14   We restate the issues on appeal as follows:

¶15   **Issue One:** Did the District Court err by concluding it had personal jurisdiction over Nodak in Montana?

¶16   **Issue Two:** Did the District Court abuse its discretion when it denied Nodak's motion to stay legal proceedings in Montana pending the outcome of Nodak's declaratory judgment action in North Dakota?

¶17   **Issue Three:** Did the District Court err in holding that Montana law applied to the Estate's stacking claims?

¶18   **Issue Four:** Did the District Court err in concluding the Estate could stack the UIM policies when the Estate presented no evidence of a reasonable expectation that the policies could be stacked?

7

¶19     **Issue Five:**  Did the District Court err by refusing to accord preclusive effect to the rulings from the North Dakota courts under the Full Faith and Credit clause to the United States Constitution?

¶20     **Issue Six:**  Does the doctrine of collateral estoppel preclude the Estate from litigating its UIM claims in Montana?

¶21     **Issue Seven:**  Do principles of comity require the Montana courts to defer to the rulings from the North Dakota Supreme Court in this case?

## STANDARD OF REVIEW

¶22     "We review a district court's grant of summary judgment *de novo*, using the standard established by M.R.Civ.P. 56.  The moving party must establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."  *Russell v. Masonic Home of Mont., Inc.*, 2006 MT 286, ¶ 9, 334 Mont. 351, ¶ 9, 147 P.3d 216, ¶ 9. Once this burden has been satisfied, the non-moving party may raise a genuine issue of material fact by presenting substantial evidence essential to one or more elements in the case.  *Russell*, ¶ 9.  We review a district court's conclusions of law to determine whether or not they are correct.  *Russell*, ¶ 9.

¶23     We review district court orders related to trial administration matters, such as a motion to stay, under the abuse of discretion standard.  *Eatinger v. Johnson*, 269 Mont. 99, 105-06, 887 P.2d 231, 235 (1994).  "The test for abuse of discretion is whether the trial court acted arbitrarily or exceeded the bounds of reason resulting in substantial injustice."  *State v. English*, 2006 MT 177, ¶ 50, 333 Mont. 23, ¶ 50, 140 P.3d 454, ¶ 50 (quotation omitted).

**DISCUSSION**

¶24   **Issue One:**  Did the District Court err by concluding it had personal jurisdiction over Nodak in Montana?

¶25   The District Court concluded Nodak waived the defense of lack of personal jurisdiction, and submitted to the jurisdiction of the District Court, by its voluntary appearance at the hearing on November 5, 2003, and by failing to properly argue the merits of this defense as required by M. R. Civ. P. 12 and M. Unif. Dist. Ct. R. 2(a). Nodak maintains this was error. First, Nodak argues it is not "found" in Montana pursuant to M. R. Civ. P 4B(1), Montana's "long arm" jurisdiction statute, and that subjecting it to personal jurisdiction in Montana offends due process. Second, Nodak asserts its "limited appearance" on July 23, 2003, preserved the defense of lack of personal jurisdiction, permitting Nodak to argue it at a later unspecified date. Thus, its participation in the November 5 hearing did not waive the defense. The Estate counters that the "limited appearance" is no longer available in Montana, and that such an appearance is simply treated as a motion to dismiss under M. R. Civ. P. 12. Accordingly, the District Court was correct to deem the motion to be without merit since Nodak failed to argue or brief it within five days pursuant to M. Unif. Dist. Ct. R. 2(a).

¶26   We agree with the Estate that Nodak waived its right to argue the defense of lack of personal jurisdiction. The District Court correctly noted that M. R. Civ. P. 12 has effectively abolished the distinction between "general" and "special" appearances. *Semenza v. Kniss*, 2005 MT 268, ¶ 17, 329 Mont. 115, ¶ 17, 122 P.3d 1203, ¶ 17 (quoting *Knoepke v. S.W. Ry. Co.*, 190 Mont. 238, 243, 620 P.2d 1185, 1187 (1980)). A "limited

9

appearance" in Montana is effectively treated as a Rule 12 motion to dismiss for lack of personal jurisdiction. *See Foster Apiaries, Inc. v. Hubbard Apiaries, Inc.*, 193 Mont. 156, 160, 630 P.2d 1213, 1215 (1981). Under M. Unif. Dist. Ct. R. 2(a), a party raising this defense has five days to file a supporting brief or argue its motion. Failure to do so subjects that party to the risk its motion will be deemed without merit. M. Unif. Dist. Ct. R. 2(b). That is precisely what happened here. Nodak's "limited appearance" was in effect a Rule 12 motion. Nodak did not argue the merits of lack of personal jurisdiction, or even raise the specific issue, until roughly three and a half months after it filed its initial appearance, and in the interim presented other arguments to the District Court. Under these circumstances, the District Court did not err in finding the Rule 12 motion without merit.

¶27 The District Court also correctly determined Nodak's participation in the court proceedings constituted a voluntary appearance under M. R. Civ. P. 4B(2), thus waiving the defense of lack of personal jurisdiction and admitting the jurisdiction of the District Court. M. R. Civ. P. 4B(2) provides that "[j]urisdiction may be acquired by our courts over any person . . . by the voluntary appearance in an action by any person either personally, or through an attorney, or through any other authorized officer, agent or employee." As we stated in *Spencer v. Ukra*, 246 Mont. 430, 804 P.2d 380 (1991), "any act which recognizes the case as in court constitutes a general appearance, and even in the face of a declared contrary intention, a general appearance may arise by implication from the defendant seeking, taking, or agreeing to some step or proceeding in the cause beneficial to himself and detrimental to the plaintiff, *other than one contesting only the*

10

*jurisdiction of the court.*" *Spencer*, 246 Mont. at 433, 804 P.2d at 382 (quotation omitted, emphasis added). Nodak could have argued personal jurisdiction without subjecting itself to the power of the District Court, but chose not to. *Semenza*, ¶ 17 (quotation omitted) (stating that a party may argue lack of personal jurisdiction without concern that such argument will "subject [it] to the general power of the court solely because of the response."). Instead Nodak sought affirmative relief from the District Court in its motion to stay on the basis of principles of comity. By filing motions seeking relief from the District Court "on other, non-jurisdictional grounds . . . [Nodak] admitted the authority and jurisdiction of the court over the company and the case." *Foster Apiaries*, 630 P.2d at 1215, 193 Mont. at 160.

¶28 Because we find the District Court did not err in concluding it had personal jurisdiction over Nodak under the foregoing rationales, we do not reach the other challenges Nodak raises to the District Court's rulings on this issue.

¶29 **Issue Two:** Did the District Court abuse its discretion when it denied Nodak's motion to stay legal proceedings in Montana pending the outcome of Nodak's declaratory judgment action in North Dakota?

¶30 Nodak argues the District Court's denial of its motion to stay constituted an abuse of discretion. Nodak asserts the District Court should have stayed the proceedings in Montana until the North Dakota declaratory judgment was decided. Nodak maintains that notions of comity required this result because the litigation was "first-filed" in North Dakota. We disagree.

¶31 In *Simmons v. State,* 206 Mont. 264, 670 P.2d 1372 (1983), we defined "comity" as

11

not a rule of law, but one of practice, convenience, and expediency. It does not of its own force compel a particular course of action. Rather, it is an expression of one state's entirely voluntary decision to defer to the policy of another. Such a decision may be perceived as promoting uniformity of decision, as encouraging harmony among participants in a system of co-operative federalism, or as merely an expression of hope for reciprocal advantages in some future case in which the interests of the forum are more critical.

*Simmons*, 206 Mont. at 289, 670 P.2d at 1385 (citations and quotations omitted).

¶32    The Ninth Circuit has described the "first to file" rule on which Nodak relies as

a generally recognized doctrine of . . . comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district. . . . [T]his "first to file" rule is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration.

*Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94-95 (9th Cir. 1982) (citations omitted).

When reviewing a decision involving the "first to file" rule on appeal "an ample degree of discretion, appropriate for disciplined and experienced judges, must be left to the lower courts." *Pacesetter Systems, Inc.*, 678 F.2d at 95 (quotation omitted).

¶33    Here, the District Court adhered to the dictates of sound judicial administration and did not abuse its discretion when it denied Nodak's motion to stay. Clearly, Montana and North Dakota both have interests in resolving the UIM stacking claims at issue. The North Dakota Supreme Court has stated North Dakota's interest in governing the relationship between a North Dakota insured and North Dakota insurer. *Nodak*, 687 N.W.2d at 234. Montana has a number of important interests as well. First, Montana has a well-established practice of applying Montana law to automobile accidents occurring

12

within its borders. *E.g.*, *Kemp v. Allstate Ins. Co.*, 183 Mont. 526, 533, 601 P.2d 20, 24 (1979); *Mitchell v. State Farm Ins. Co.*, 2003 MT 102, ¶¶ 20-21, 315 Mont. 281, ¶¶ 20-21, 68 P.3d 703, ¶¶ 20-21. Also, in Montana an injured party may bring a suit against the tortfeasor and the insurance company in one action when UIM coverages are sought. See *e.g.*, *State of Mont. ex. rel. Gadbaw v. Mont. Eighth Jud. Dist. Ct.*, 2003 MT 127, ¶¶19-25, 316 Mont. 25, ¶¶ 19-25, 75 P.3d 1238, ¶¶ 19-25. Because the accident occurred in Montana and the tortfeasor was a Montana resident, the claim arose here and Montana is the proper forum within which to "settle the rights, status, and other legal relations in that underlying action." *Nodak*, 687 N.W.2d at 235 (Maring, J., dissenting). Choice of law and the issue of stacking are critical in making these final determinations and are well within the judicial competency of the District Court in Gallatin County. By denying Nodak's motion to stay, the District Court was simply trying to prevent needless "piecemeal litigation" with respect to these claims. *Nodak*, 687 N.W.2d at 235 (Maring, J., dissenting) (stating that "by deciding the declaratory judgment action [in North Dakota], we encourage piecemeal litigation."). Additionally, Nodak fails to provide any evidence that substantial injustice resulted from the District Court's denial of the motion. Instead, the District Court's decisions were an example of sound judicial administration. Its actions were not arbitrary and did not "exceed[] the bounds of reason resulting in substantial injustice." *English*, ¶ 50.

¶34    Moreover, as the Estate points out, there is an exception to the "first to file" rule where a party's "first filing" is simply an act of forum-shopping. *Alltrade, Inc. v. Uniweld Prod. Inc.*, 946 F.2d 622, 628 (9th Cir. 1991). Nodak's rush to the North

13

Dakota courts in this case is a paradigmatic example of such conduct. Nodak apparently believed it would get a more favorable result in the North Dakota courts on the UIM stacking issue, and therefore sought to lull a delay in the commencement of the Montana case in order to secure an advantage there. See ¶¶ 6-7. Under such circumstances, Nodak's invocation of "comity" rings hollow. Accordingly, we conclude the District Court did not abuse its discretion by denying Nodak's motion to stay the Montana proceedings.

¶35 **Issue Three:** Did the District Court err in holding that Montana law applied to the Estate's stacking claims?

¶36 Nodak maintains the District Court erred when it concluded Montana law applied to the Estate's UIM stacking claims. Nodak asserts that an application of the choice of law analysis from the *Restatement (Second) of Conflict of Laws* §§ 188, 193 (1971) leads to the conclusion that North Dakota law should apply to the Estate's stacking claims. In essence, Nodak argues the UIM claims concern a North Dakota insurance transaction to which only North Dakota law should apply and that Montana's relationship is limited solely to the fact that the accident occurred here. The relevant sections of the Restatement provide as follows:

> **§ 188. Law Governing in Absence of Effective Choice of Law by the Parties**
> (1) The rights and the duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
These contacts are to be evaluated according to their relative importance with respect to the particular issue.

§ 193. Contracts of Fire, Surety or Casualty Insurance
The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

§ 6. Choice-of-Law Principles
(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) Where there is no such directive, the factors relevant to the choice of law include . . . . [Not applicable.]

¶37 The Estate contends the District Court was correct to apply Montana law to the Estate's claims. Particularly, the Estate points to *Youngblood v. Am. States Ins. Co.*, 262 Mont. 391, 866 P.2d 203 (1993) and *Kemp* for the proposition that Montana has long applied Montana law to automobile accidents occurring within its borders. The Estate also claims the conflicts analysis we applied under the Restatement in *Mitchell* points to the conclusion that Montana law controls. Nodak argues *Mitchell* is distinguishable on its facts and does not apply to the instant case.

¶38 In *Mitchell*, we analyzed a claim similar to the one before us now. In that case, Plaintiff Mitchell was injured in an automobile accident in Montana. At the time he was

15

living and working in Montana, but was insured under his parents' policies issued in California. To cover damages from the accident, Mitchell tried to stack his parents' UIM policies, although they covered vehicles garaged in California at the time of the accident. Mitchell sought to apply Montana law to his stacking claims. The District Court ruled against him, holding that California law applied. At issue on appeal before this Court was whether California or Montana law would govern the determination of Mitchell's stacking claims.

¶39 In *Mitchell* we outlined the analysis to be applied when resolving conflicts of laws questions under the Restatement. We began by noting that under our prior decisions in *Phillips v. Gen. Motors Corp.*, 2000 MT 55, 298 Mont. 438, 995 P.2d 1002, and *Casarotto v. Lombardi*, 268 Mont. 369, 886 P.2d 931 (1994), we would apply the Restatement (Second) Conflict of Laws to Mitchell's claims. *Mitchell*, ¶ 16. We stated that we would approach the Restatement "criteria in a careful, step-by-step fashion, to avoid misapplication of the law." *Mitchell*, ¶ 17.

¶40 Accordingly, before conducting an analysis under §§ 188(2) and 193, our first task was to determine "whether Montana law addressed the choice of law concerning Mitchell's . . . policy pursuant to § 6(1)." *Mitchell*, ¶ 18. We noted that § 6(1) of the Restatement "requires a court to first look to relevant state law when determining applicable law." *Mitchell*, ¶ 21. We also noted § 28-3-102, MCA, provides that " '[a]

16

contract is to be interpreted according to the law in [*sic*][1] usage where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.' " *Mitchell*, ¶ 19 (quoting § 28-3-102, MCA). From this we concluded that "unless the terms of the insurance contract provide otherwise . . . where an insurance contract designates the place of performance to be any state where a claim arises, performance occurs where the insured obtains judgment." *Mitchell*, ¶ 20 (citation omitted). Linking these analyses together we held "[i]t logically follows, that the place of performance is also the place where an insured is entitled to receive benefits, has incurred accident related expenses, or is entitled to judgment." *Mitchell*, ¶ 20. On this premise we concluded Montana was the place of performance of the contract because

> Mitchell was working and living in Montana at the time of the accident; the underinsured tortfeasor's vehicle was insured in Montana; Mitchell's medical expenses were incurred in Montana; Mitchell settled with the [tortfeasors'] insurers for the policy limit giving rise to the underinsured motorist claim in Montana; and judgment concerning the accident will be rendered and paid in Montana.

*Mitchell*, ¶ 22.

¶41 While the facts in this case differ slightly from those in *Mitchell*, the choice of laws analysis is comparable. As Nodak notes, the Wamsleys were residents of North Dakota and had none of the Montana contacts that the Plaintiff had in *Mitchell*. Nodak also provides a thorough factor-based analysis under § 188(2) and § 193 of the Restatement, and shows why that analysis favors the application of North Dakota law.

---

[1] The portion of § 28-3-102, MCA, cited in *Mitchell* actually reads as follows: "A contract is to be interpreted according to the law *and* usage of the place where it is to be performed . . . ." (Emphasis added.)

Yet Nodak fails to apply the careful "step-by-step" approach we applied in *Mitchell* and skips over the analysis under § 6(1) of the Restatement which is required *before* proceeding to the general factor-based analysis in § 188(2). As a result, Nodak overlooks the operation of § 28-3-102, MCA, and our holding in *Mitchell* to the effect that one must first determine the place of performance of the insurance contract.

¶42 Absent language to the contrary, the place of performance of an insurance contract is "where an insured is entitled to receive benefits, has incurred accident related expenses, or is entitled to judgment." *Mitchell*, ¶ 20. The factor-based analysis described in the Restatement comes into play only after it has been determined that the contract does not designate a place of performance. If Montana is determined to be the place of performance, then no further analysis under the Restatement factors is required.

¶43 Here, Montana is the place of performance of Nodak's insurance contracts. The UIM policies in this case contain nearly identical boilerplate language to the policies at issue in *Mitchell*. Both policies specify the area of coverage to include "the United States of America, its territories and possessions; Puerto Rico; or Canada." Nodak's attempt to distinguish the policies here from those in *Mitchell* is unavailing. Nodak correctly points out that the endorsement section of the policies entitled "Underinsured Motorist Coverage—North Dakota" does not specify a territory of coverage for UIM claims. But neither does it state a limitation of such coverage. Further, the provision of the policy itself entitled "Part C—Underinsured Motorist Coverage" clearly adopts as its territory of coverage the area specified in "Part F—General Provisions." This latter provision specifies a territory of coverage for the entire policy, including the UIM provisions, and

18

does not indicate a more limited territory of coverage for UIM claims. Absent any limitations of coverage in the endorsement to the UIM policy, nothing in the policies indicates the UIM territory of coverage to be other than "the United States of America, its territories and possessions; Puerto Rico; or Canada."

¶44 Montana is where the accident occurred and the damages arose. It is the site of the personal injury action filed by the Estate, and the forum in which an order of judgment against Stanton, the Montana tortfeasor, has been rendered. See ¶ 12. Moreover, Nodak has already paid the Estate $200,000.00 in UIM claims submitted by the Estate's counsel in Montana. Therefore, we conclude the District Court did not err in holding that Montana law should apply to the stacking and coverage issues before us.

¶45 **Issue Four:** Did the District Court err in concluding the Estate could stack the UIM policies when the Estate presented no evidence of a reasonable expectation that the policies could be stacked?

¶46 Nodak argues our decision in *Hardy* does not apply to the UIM claims here because under *Hardy* the Estate is required, but failed to, prove the Wamsleys had a reasonable expectation they would be able to seek UIM coverage under all three policies although they paid a separate premium for each. Nodak further maintains that for *Hardy* to apply the Estate must show the Wamsleys were charged premiums for stacked UIM coverages, and that they paid a premium for coverage they did not receive.

¶47 The Estate argues that Nodak raises this issue for the first time. We agree. A review of the record shows Nodak had ample opportunity to present this theory to the District Court but failed to do so. Thus, out of fairness to the District Court we will not

19

consider it on appeal for the first time. *Timis v. Young*, 2001 MT 63, ¶ 8, 305 Mont. 18, ¶ 8, 22 P.3d 1122, ¶ 8.

¶48 **Issue Five:** Did the District Court err by refusing to accord preclusive effect to the rulings from the North Dakota courts under the Full Faith and Credit clause to the United States Constitution?

¶49 Nodak argues the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, required the District Court to grant preclusive effect to the North Dakota rulings on choice of law and stacking. Nodak asserts those rulings were res judicata to issues raised by the Estate in Montana, and that the District Court erred in not granting them full faith and credit. Nodak points out that the North Dakota District Court ruled on choice of law on October 7, 2003, several weeks prior to the Montana District Court's ruling applying Montana law to the Estate's stacking claims. In response, the Estate maintains the District Court did not err because the required elements of res judicata are not satisfied. In particular, the Estate argues that the Wamsleys' children, who appeared in the North Dakota action, were not in privity with the Estate. The Estate also argues full faith and credit is not required in this case because recognition of the North Dakota rulings would impermissibly interfere with the litigation in Montana and Montana's important interests in this matter.

¶50 The Full Faith and Credit clause, U.S Const. art. IV, § 1, states that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." Pursuant to this clause, the first Congress enacted 28 U.S.C. § 1738, which specifies that properly authenticated judicial proceedings are to be given national effect. The United States Supreme Court has explained the "animating purpose"

20

of this clause "was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin." *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 232,118 S. Ct. 657, 663 (1998) (quotation omitted). Accordingly, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land." *Baker*, 522 U.S. at 233, 118 S. Ct. at 663-64.

¶51 We have recognized that "the full faith and credit obligation owed to final judgments is exacting. A final judgment rendered by a state court is entitled to full faith and credit in the courts of its sister states." *Carr v. Bett*, 1998 MT 266, ¶ 39, 291 Mont. 326, ¶ 39, 970 P.2d 1017, ¶ 39. In practical terms, full faith and credit " 'generally requires every State to give to a judgment at least the *res judicata* effect which the judgment would be accorded in the State which rendered it.' " *Carr*, ¶ 39 (quoting *Durfee v. Duke*, 375 U.S. 106, 109, 84 S. Ct. 242, 244 (1963)). Moreover, there is no public policy exception for the full faith and credit due judgments from another jurisdiction. *Carr*, ¶ 45. Full faith and credit may demand "submission . . . even to hostile policies reflected in the judgment of another State, because [of] the practical operation of the federal system . . . ." *Baker*, 522 U.S. at 233, 118 S. Ct. at 664 (quotation omitted). Thus in *Carr* we held that Montana was required to grant full faith and credit to a Wyoming judgment "even assuming the law underlying the judgment

21

contravenes the public policy of Montana." *Carr*, ¶ 45; See also *E.g. Finstuen v. Crutcher*, 496 F.3d 1139 (10th Cir. 2007) (holding that full faith and credit requires Oklahoma to recognize an adoption by a same sex couple already formalized in another state even though Oklahoma statute specifically prohibits such adoptions on public policy grounds).

¶52    The first step in this analysis is to determine whether the judgment in the North Dakota District Court is res judicata to the action in the Montana, where full faith and credit is sought.[2]  To satisfy the res judicata criteria in Montana, the following elements must be satisfied:  "(1) the parties or their privies must be the same; (2) the subject matter of the action must be the same; (3) the issues must be the same, and must relate to the same subject-matter; and (4) the capacities of the persons must be the same in reference to the subject-matter and to the issues between them." *Lane v. Mont. Fourth Jud. Dist. Ct.*, 2003 MT 130, ¶ 23, 316 Mont. 55, ¶ 23, 68 P.3d 819, ¶ 23 (quotation omitted).  The Estate contends element number one, identity of the parties or their privies, is not satisfied in this case.

¶53    As we have previously stated "the concept of a 'privy' in the context of a judgment applies to one whose interest has been legally represented at trial.  We have similarly defined privies as those who are so connected in estate or in blood or in law as

---

[2] As a technical matter, we note that full faith and credit requires a sister state to give a judgment the res judicata effect it would have in the State which initially rendered the judgment. *Carr*, ¶ 39.  Accordingly, it would be more appropriate to conduct the res judicata analysis under North Dakota law because the declaratory judgment was issued there.  However, both parties have argued res judicata under Montana law, and neither party has alleged the res judicata criteria differ substantively between Montana and North Dakota.

to be identified with the same interest and, consequently, affected with each other by litigation." *Holtman v. 4-G's Plumbing & Heating, Inc.,* 264 Mont. 432, 437, 872 P.2d 318, 321 (1994). Here, the record shows that the Wamsleys' children and the Estate are in privity because their legal interests in this matter are the same and were represented similarly in both forums. In North Dakota, the Wamlseys' children argued against applying North Dakota law to their UIM claims, and the same position was taken by the Estate in Montana. The Wamsleys' children and the Estate had the same interest in advancing those arguments because of the potential benefit to both the Estate and the children if they were allowed to stack UIM claims. The fact that a conflict of interest might develop later between the children and the Estate is not significant here because, in either event, more money would be available to either the Estate or the Wamsleys' surviving children if the UIM claims could be stacked. Additionally, we note that the same attorney appeared in North Dakota and Montana, arguing the same basic position in both forums. For these reasons, we agree with Nodak that the privity requirement of res judicata is satisfied.

¶54　Accordingly, we agree with Nodak that the basic elements of res judicata seem to be satisfied by the North Dakota rulings. If full faith and credit were to be accorded the North Dakota rulings, then theoretically after October 7, 2003, the District Court in Montana would be compelled to apply North Dakota law to the Estate's stacking claims. However, the unquestioning application of full faith and credit in this case is problematic.

¶55　The Estate advances two other arguments against granting full faith and credit in this case which deserve careful consideration. First, the Estate argues the North Dakota

23

rulings should not be granted full faith and credit because they greatly offend the public policy in Montana in favor of stacking. However, this is not an appropriate basis upon which to refuse full faith and credit because, as a general rule, a judgment must be afforded full faith and credit regardless of how greatly it offends the public policy of Montana. *Carr*, ¶ 45. However, the Estate advances a second argument against granting full faith and credit which we do find compelling.

¶56 The Estate argues the North Dakota rulings are not due full faith and credit because they impermissibly interfere with the Montana litigation. In this connection, it bears repeating that these two cases proceeded simultaneously in two state courts, with competing rulings being sought and obtained within weeks, and sometimes days, of each another. Unlike the classic situation involving the entry of judgment by one court prior to the commencement of the ensuing case in another, we are faced here with an anomalous state of affairs; indeed, Nodak has cited no precedent addressing how and even whether full faith and credit is due under such circumstances. It is against this backdrop that we analyze whether the District Court erred in declining to accord the North Dakota rulings full faith and credit.

¶57 Full faith and credit due to the judgment from a sister state is not automatic. The Full Faith and Credit clause "is not an inexorable and unqualified command. It leaves some scope for state control within its borders of affairs which are peculiarly its own . . . [and] there are limits to the extent to which the laws and policy of one state may be subordinated to those of another." *Pink v. A.A.A. Hwy. Exp.*, 314 U.S. 201, 210, 62 S. Ct. 241, 246 (1941); *Magnolia Petroleum Co. v. Hunt,* 320 U.S. 430, 438, 64 S. Ct. 208, 213,

24

(1943), *overruled on other grounds by Thomas v. Wash. Gas Light Co.*, 448 U.S. 261, 100 S. Ct. 2647 (1980), ("we assume . . . that the command of the Constitution and the statute is not all-embracing, and that there may be exceptional cases in which the judgment of one state may not override the laws and policy of another . . . ."). Thus, the United States Supreme Court has held that "[t]he Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.' " *Baker*, 522 U.S. at 232, 118 S. Ct. at 663 (quoting *Pacific Employers Ins. Co. v. Indust. Accident Commn.*, 306 U.S. 493, 501, 59 S. Ct. 629, 632 (1939)). Similarly, the Supreme Court has denied the enforcement of anti-suit injunctions which purport to control a court's actions in another state. "Orders commanding action or inaction have been denied enforcement in a sister State when they purported to accomplish an official act within the exclusive province of that other State *or interfered with litigation over which the ordering State had no authority*." *Baker*, 522 U.S. at 235, 118 S. Ct. at 665 (emphasis added). This view is echoed in the *Restatement (Second) of Conflicts of Laws* § 103 cited by the Estate.

> A judgment rendered in one State of the United States need not be recognized or enforced in a sister State if such recognition or enforcement is not required by the national policy of full faith and credit because it would involve an improper interference with important interests of the sister State.

¶58 As the comment to the Restatement indicates, the exception represented in this rule is "rare" and its precise parameters, as defined by the United States Supreme Court, remain "uncertain." *Restatement (Second) of Conflict of Laws* § 103 cmt. a. However, there are cases where "the national policy of full faith and credit giv[es] way to the

important interests of the sister state." *Reading & Bates Const. Co. v. Baker Energy Resources Corp.*, 976 S.W.2d 702, 714 (Tex. App. 1998). Thus in *Reading* the Texas Court of Appeals refused to grant full faith and credit to a Canadian judgment subsequently recognized under Louisiana law, without first deciding for itself if it was compelled to enforce the Canadian judgment under Texas law. *Reading*, 976 S.W.2d at 714-15. The Texas Court of Appeals acknowledged its duty to generally recognize valid Louisiana judgments under full faith and credit, but rejected the notion that it was automatically compelled to give a Canadian judgment full faith and credit in Texas simply because it was first recognized in Louisiana. *Reading*, 976 S.W.2d at 715. The Texas court noted its legitimate interests in evaluating a foreign judgment before enforcement in Texas, and rejected the attempt to enforce the Canadian judgment "through the back door" via Louisiana law. *Reading*, 976 S.W.2d at 715.

¶59    Here, the North Dakota declaratory judgment action was begun in an attempt to apply North Dakota law "through the back door" in Montana, and avoid a potentially adverse result here. As noted above, Nodak took advantage of the Estate's good graces by obtaining extensions to respond to its demands, all the while buying time to file a pre-emptive action in North Dakota. See ¶ 6. It is evident that the declaratory judgment in North Dakota was brought for the purpose of preempting the District Court in Montana from exercising control over the judicial processes necessary to resolve this dispute. We agree with Justice Maring that the North Dakota rulings simply constituted an "advisory

opinion" on choice of law and stacking. *Nodak*, 687 N.W.2d at 236 (Maring, J., dissenting). The District Court in Montana was not bound by those rulings.[3]

¶60    We are troubled by Nodak's invocation of full faith and credit in an attempt to confer upon District Courts in North Dakota interlocutory control over District Courts in Montana. Nodak can point to no cases where full faith and credit has given one state the power to issue declaratory judgments aimed at exerting such control over *ongoing* litigation in a forum state. Permitting North Dakota's declaratory judgments to have preclusive effect over Montana courts in this case "would mean in effect that the courts of [North Dakota] can control what goes on in the courts of [Montana]." *Baker*, 522 U.S. at 236 n. 9, 118 S. Ct. 665 n. 9 (quotation omitted).

¶61    We emphasize that our decision here is not based upon the fact that anti-stacking statutes are contrary to public policy in Montana. We acknowledge there is no public policy exception to full faith and credit. We also recognize that this case presents a unique set of circumstances for which no clear rule in the full faith and credit jurisprudence has been established. *See Baker*, 522 U.S. at 245, 118 S. Ct. at 670 (Kennedy, J., concurring) (noting that the United States Supreme Court has never exactly determined at what point "an otherwise valid judgment cannot intrude upon essential process of courts outside of the issuing State . . . ."). Nonetheless, we conclude it would

---

[3] As the Estate notes, Nodak never sought to have the declaratory judgment from North Dakota certified in Montana pursuant to the Uniform Enforcement of Foreign Judgments Act, §§ 25-9-501 to 508, MCA. As we stated in *Carr* "[t]he UEFJA provides the procedural framework for enforcing foreign judgments in the states that have enacted it." *Carr*, ¶ 41. This raises the question—for the time being unresolved—as to whether a Montana court is required to pay any recognition to a declaratory judgment from a sister state which is not certified pursuant to the statutory requirements of the UEFJA, or whether the full faith and credit due the judgments from another state transcends this statutory framework.

27

defeat the purpose of forging national unity to use full faith and credit to needlessly expand a single cause of action into multi-state litigation. If anything, such a use of the full faith and credit clause simply balkanizes the legal process, brings state courts into greater conflict, and diminishes respect for the type of state sovereignty the first Congress envisioned. For these reasons, we conclude the District Court did not err in declining to accord full faith and credit to the competing rulings issued by the North Dakota courts.

¶62 **Issue Six:** Does the doctrine of collateral estoppel preclude the Estate from litigating its UIM claims in Montana?

¶63 Nodak argues the doctrine of collateral estoppel barred the Estate from pursuing its UIM claims in Montana once the District Court in North Dakota had ruled on the choice of law and UIM claims. However, Nodak points to no authority which supports the application of collateral estoppel in situations where contemporaneous suits are unfolding. As we have stated "[c]ollateral estoppel, or issue preclusion, bars the reopening of an issue that has been litigated and determined in a *prior suit*." *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 15, 331 Mont. 281, ¶ 15, 130 P.3d 1267, ¶ 15 (emphasis added). The suits in this matter were contemporaneous, with Montana and North Dakota ruling on various aspects of the cases at parallel times. The doctrine has no applicability in this context and did not operate to bar the Estate's UIM claims in Montana. Furthermore, assuming *arguendo* collateral estoppel did apply here, the District Court was not required to grant the North Dakota rulings full faith and credit because they would impermissibly interfere with the Montana litigation as explained above in our discussion of Issue Five.

¶64 **Issue Seven:** Do principles of comity require the Montana courts to defer to the rulings from the North Dakota Supreme Court in this case?

¶65 Lastly, Nodak asserts that general principles of comity require Montana to defer to the sovereignty of North Dakota and give effect to the North Dakota Supreme Court's ruling in *Nodak*. We disagree. As we noted above at ¶ 31, a state's decision to extend comity to another state is entirely voluntary. *Simmons*, 206 Mont. at 289, 670 P.2d at 1385. Moreover, unlike full faith and credit, comity need not be extended in cases where "it would contravene the public or judicial policy of the forum state." *Kane v. Kane*, 198 Mont. 335, 338, 646 P.2d 505, 507 (1982) (quotation omitted); *Oberson v. Federated Mut. Ins. Co.*, 2005 MT 329, ¶ 10, 330 Mont. 1, ¶ 10, 126 P.3d 459, ¶ 10. As our foregoing analysis suggests, Montana is entitled to comity in this matter just as much as North Dakota. While we respect North Dakota's interests in regulating the relationship between its resident insurers and their insureds, Montana has a number of weighty interests in this matter as we have discussed above. To paraphrase the District Court, comity should extend in all directions: east to west, as well as west to east.

## CONCLUSION

¶66 For the foregoing reasons, the decision of the District Court is affirmed.

/S/ PATRICIA COTTER

We concur:

/S/ JAMES C. NELSON
/S/ BRIAN MORRIS

29

Justice Jim Rice, concurring.

¶67    I concur with the Court's holding herein.

¶68    Nodak has offered substantive arguments which I believe are compelling but which, because of procedural or postural issues in this litigation, I am not able to adopt. I agree that Nodak's personal jurisdiction defense was not preserved before the District Court and thus waived. I concur that the District Court did not abuse its discretion by denying Nodak's comity-based request for a stay under the circumstances here, specifically, the litigation tactics explained by the Court, though I do not necessarily agree, as discussed more fully below, that we have or should have a "practice of applying Montana law to automobile accidents occurring within [our] borders," Opinion, ¶ 33, which would render a careful application of the statutes and Restatement factors unnecessary or secondary. Similarly, I believe that the circumstances here, described by the Court as "anomalous," place this case within a very narrow exception to the general rule that we give full faith and credit to the North Dakota judgment. That exception is rightfully a narrow one, as we should have no interest in either casually dishonoring a judgment entered elsewhere or encouraging dueling litigation here. And, though I am sympathetic with some of the thoughts Justice Warner expresses in his opinion regarding *Hardy* and the stacking issue, I nonetheless must concur with the Court that the merits of this issue cannot be reached because it was raised for the first time on appeal.

¶69    Finally, I concur with the Court's holding on the merits of the choice of law issue, Issue Three, though I do not necessarily agree with the entirety of the analysis. Since

adopting the Restatement's formulation for determining choice of law issues in *Casarotto*, the Court has, in my view, used inconsistent analytical approaches which need to be resolved or clarified. *Compare Mitchell v. State Farm Ins. Co.*, 2003 MT 102, ¶ 20, 315 Mont. 281, ¶ 20, 68 P.3d 703, ¶ 20 (analyzing choice of law for an automobile insurance contract under § 28-3-102, MCA, and despite the absence of place of performance, determining that the place of performance is where the injury occurs, thereby bypassing analysis pursuant to § 188 of the Restatement) *with Burchett v. Mastec N. America, Inc.*, 2004 MT 177, ¶¶ 13, 19, 322 Mont. 93, ¶¶ 13, 19, 93 P.3d 1247, ¶¶ 13, 19 (analyzing choice of law for an employment contract under § 28-3-102, MCA, and determining that where the contract does not indicate a place of performance, § 28-3-102, MCA, may be unworkable and choice of law is determined by applying § 188 of the Restatement).

¶70 Here, the Court's analysis begins at the right place but quickly turns to the result in *Mitchell* and implies therefrom that because the case involves an automobile accident occurring in Montana, the "place of performance" must necessarily be Montana. We should be wary of creating a bright-line rule whereby we always imply that the parties intended the place of injury to also be the place of performance. Such an approach does not give effect to the original intent of the parties, which is the primary concern of the Restatement. Further, such an approach may, in some future case where a Montana resident is involved in an accident outside the state, dictate that we apply the law of the other state, because the place of performance has become synonymous with the place of

injury. I believe we should clarify our law in order to provide a clear and consistent analytical approach under the Restatement and our statutes to these contract questions.

/S/ JIM RICE

Chief Justice Karla M. Gray and District Judge E. Wayne Phillips join in the concurring opinion of Justice Rice.

/S/ KARLA M. GRAY

/S/ E. WAYNE PHILLIPS
Honorable E. Wayne Phillips, District Judge, sitting in place of Justice W. William Leaphart

Justice John Warner, concurring and dissenting.

¶71 I concur with the Court in several respects. I disagree with the Court on the seminal issue of whether the District Court was required by conflict of laws principles previously adopted and by comity to dismiss this action. This action should either be decided under North Dakota law or dismissed in deference to the North Dakota judgment.

¶72 This case stems from the Court's decision in *Hardy*, which unduly restricts the right to contract, and denies the legislature its rightful role in making policy decisions. The Court compounded the problems inherent in *Hardy* when it decided *Mitchell* by misconstruing § 28-3-102, MCA, and essentially ignoring the uniform conflict of law principles which were adopted in *Casarotto*. *Casarotto*, 268 Mont. at 373-74, 886 P.2d at 934. Now, the Court again errs by refusing to let North Dakota courts decide questions arising between North Dakota citizens concerning a North Dakota contract.

¶73 The Court discusses seven issues. ¶¶ 15-21. I do not disagree with the entirety of the Court's analysis. I agree that the District Court did not err in concluding that it had personal jurisdiction over Nodak, ¶ 25; I agree the District Court did not err in refusing to accord preclusive effect to the North Dakota Judgment under the Full Faith and Credit Clause to the United States Constitution, ¶ 61; and I agree that collateral estoppel does not preclude the Estate from litigating its claims in Montana, ¶ 63. While the record is not as clear as the Court implies, ¶ 34, considering Nodak's actions in this case, I conclude that the District Court did not abuse its discretion when it denied Nodak's motion to stay Montana proceedings pending the outcome of the North Dakota action

based on the "first to file" rule.[1] Along with Chief Justice Gray and Justice Rice, I disagree with the result of *Hardy*. *Hardy*, ¶ 49 (Rice, J. & Gray, C.J., dissenting). The case is, however, the law in Montana. Unless and until *Hardy* is overturned there is no error in the District Court's conclusion of law that under Montana law the Estate could stack the UIM policies.

¶74 I disagree with the Court and would hold that the District Court erred in concluding that Montana law applies to the Estate's stacking claims; alternatively, I would dismiss this action, deferring to the decision of the North Dakota Supreme Court.

¶75 Section 28-3-102, MCA, provides:

> A contract is to be interpreted according to the law and usage of the place where it is to be performed or, if it does not indicate a place of performance, according to the law and usage of the place where it is made.

¶76 The error the Court makes is in holding that Montana law must apply every time a contract made elsewhere has some effect in Montana. As it erroneously did in *Mitchell*, the Court again says when an automobile accident happens in Montana, Montana is "the" place where an applicable insurance contract is performed. Then, because the contract is to be performed here, pursuant to § 28-3-102 no further analysis under the Restatement factors is required. ¶¶ 40, 41; *Mitchell*, ¶ 20. Under the Court's interpretation of § 28-3-102, there is no need for conflict of law principles. If the Court's premise is accepted, when there is sufficient contact with Montana to give its courts jurisdiction, a contract,

---

[1] The "first to file" rule, noted by the Court at ¶¶ 32, 34, is an important factor in conflict of laws jurisprudence. However, under the facts of this case I agree with the Court that it is not determinative.

any contract, is performed in Montana. The Court is incorrect. In truth, § 28-3-102 is not an absolute directive that when an accident happens in Montana, Montana law must always apply to the interpretation of an applicable insurance contract.

¶77 The fact that an automobile insurance policy provides coverage throughout the United States is not alone sufficient to show that it is only performed where an accident happens. It is obviously the intention of the parties to the contract that it will be performed in many places. In a case such as presented here, Montana is simply "a" place the insurance contract may be performed. The contacts with Montana noted by the Court at ¶ 44 may have relevance in determining which state's law applies. However, these factors are most closely related to the Estate's tort claims against Stanton, and are only tangentially related to the contract claims the Estate makes against Wamsley's insurer, Nodak. The fact that the accident happened in Montana is simply one of several factors to be considered in making the decision which law should apply. But, it is not the only factor. It is obvious that North Dakota, where the parties to this action are domiciled and live, where they negotiated for the insurance, where they entered the contract, where the premiums were paid, where the car involved was garaged, and where any payment from Nodak will be made, is also a place where the insurance contract will be performed.

¶78 There are many instances, when an accident happens in Montana, that an insurance contract should be interpreted by applying Montana law. Likewise, Montana law may be appropriately applied in interpreting an insurance contract when an accident did not happen in Montana.

¶79 In my view, the Court errs in holding that Montana courts will not consider multi-

state insurance contacts as directed by the *Restatement (Second) of Conflict of Laws* § 193, which the Court sets out at ¶ 36.

¶80    Other courts, interpreting statutes identical to § 28-3-102, have concluded that the law of the state where an insurance contract was made should generally apply, rather than the law of the state where an accident happened to occur. *E.g. Rhody v. State Farm Mut. Ins. Co.*, 771 F.2d 1416, 1420 (10th Cir. 1985); *Great West Cas. Co. v. Hovaldt*, 603 N.W.2d 198, 201 (S.D. 1999); *Rush v. Travelers Indem. Co.*, 891 F.2d 267, 270 (10th Cir. 1989) (citing *Rhody*, 771 F.2d at 1420); *Bohannan v. Allstate Ins. Co.*, 820 P.2d 787, 797 (Okla. 1991). For example, in *Rhody*, the Tenth Circuit held that an identical Oklahoma statute did not require the application of Oklahoma law when an automobile insurance contract was entered in Texas, but an accident occurred in Oklahoma. The court reasoned that the wording of the statute "restrict[ed] application of the law of the place of performance of a contract to cases in which the place of performance is indicated in the contract." *Rhody*, 771 F.2d at 1420 (emphasis omitted). Simply establishing the United States as the area of coverage was insufficient, in the Tenth Circuit's view, to indicate the intent for the place of performance to be wherever an incident occurred and gave rise to a claim. *Rhody*, 771 F.2d at 1420.

¶81    These cases and other cases addressing similar facts recognize that the state where the parties entered the contract has a greater interest in having its own law applied than a state that is only connected to the parties by happenstance. In an identical situation, the Oregon Supreme Court declined to apply its own law to interpret an insurance contract entered into in Michigan when the plaintiff was involved in an automobile accident in

Oregon because the "place of plaintiff's injury was fortuitous." *Davis v. State Farm Mut. Auto. Ins. Co.*, 507 P.2d 9, 10 (Or. 1973). Instead, the court concluded it was better to apply the law of the state with more connection to the contract between the insurer and insured. *Davis¸* 507 P.2d at 10. *See also Lee v. Saliga*, 373 S.E.2d 345, 352 (W. Va. 1988) (concluding that another state's law should apply to interpret an insurance contract where West Virginia's "only connection to the dispute is the fortuity that the accident occurred there"); *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1169 (Fla. 2006) (declining to apply Florida law when the insureds were not permanent residents of Florida because "[t]o do so would throw conflicts-of-law jurisprudence into disarray and destroy the stability in contractual arrangements").

¶82 This Court has recognized in the context of employment law that when a contract does not indicate a particular place of performance, § 28-3-102 does not require the application of Montana law to the contract. *See Burchett v. Mastec N. Am., Inc.*, 2004 MT 177, 322 Mont. 93, 93 P.3d 1247. In *Burchett*, we concluded that § 28-3-102 did not apply because "[a]t the time [they] entered into the employment contract, the parties did not know where it was to be performed; the work . . . was transitory by nature." *Burchett*, ¶ 13. The contract in this case is analogous. As in *Burchett*, when the Wamsleys and Nodak entered the insurance contract, they did not know that performance would occur in Montana. Section 28-3-102 thus does not mandate the application of Montana law, based on this Court's own reasoning in *Burchett*.

¶83 The insurance contract at issue here was between residents of North Dakota who conduct their business there. It was entered in North Dakota and the vehicles were

37

principally garaged in North Dakota. Nodak set its rates and the insured's paid their premiums in North Dakota. The parties and the insurance contract have virtually no connection to Montana other than the "fortuity that the accident occurred [h]ere." *Lee*, 373 S.E.2d at 352. Considering that the tort claims the Estate makes against Stanton only peripherally involve the contract claims against Nodak, the place where the insurance contract was negotiated, the place where it was made, the place of performance, the principal location of the insured autos, and considering the domicile, residence and place of business of the parties, it becomes obvious that North Dakota law should apply to the Estate's claims against Nodak. *See Restatement (Second) of Conflict of Laws* § 188(2).

¶84 Further, in my view, this Court should grant comity to North Dakota in this instance for a reason which the Court does not mention. The Montana Supreme Court has the right and the duty to correctly interpret Montana law for the benefit of Montana citizens. Still, Montana is a part of the United States and the judgments of our sister states are important—especially to the citizens of those other states. The only Montanans affected by the Court's decision today are the local lawyers. The refusal to grant comity in this case, where only North Dakota policy is directly affected, impinges unnecessarily upon the harmonious interstate relations which are part and parcel of the spirit of co-operative federalism. *See Simmons*, 206 Mont. at 291, 670 P.2d at 1385.

¶85 There are now two diametrically opposed judgments, one in North Dakota and the other in Montana. It remains to be seen if Montana's decision today aids the Estate's pursuit of an insurance payment the Wamsleys did not bargain for, or only necessitates

38

further litigation between North Dakota citizens.   I would defer to the North Dakota judgment and dissent from the Court's decision not to do so.


/S/ JOHN WARNER